LAW OFFICES OF
**DONNA R. NEWMAN**
ATTORNEY AT LAW
20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007
TEL. 212-229-1516
FAX 212-676-7497
DONNANEWMANLAW@AOL.COM
MEMBER: N.Y. & N.J. BAR

January 13, 2021

Hon. Gregory H. Woods
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:  *United States v. Nader Fana*, **19-Cr.-011 (GHW)**
      **Renewed Motion for Compassionate Release**

Dear Judge Woods:

      On behalf of Mr. Fana, please accept this renewed motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

      Mr. Fana pled guilty before Your Honor to conspiring to distribute and possess with intent to distribute cocaine base in violation of 21 U.S.C. § 841(b)(1)(C). On January 29, 2020, Your Honor sentenced Mr. Fana to a term of 16 months of incarceration, which represented a variance from his Guidelines sentencing range of 33-41 months. In granting a variance, the Court considered that Mr. Fana had self-surrendered upon learning that a warrant had issued for his arrest, that he played a minor role in the offense conduct, that he had fully complied with the terms of his pretrial release, that he had made substantial efforts to secure his GED while on pretrial release, and that he expressed sincere remorse for his offense conduct. Mr. Fana is currently serving his sentence at Allenwood Medium FCI, with a release date of March 4, 2021.

## STATEMENT OF FACTS

### I.  Procedural Background

      As the Court may recall, in March 2020, the Defense wrote to Your Honor asking the Court to issue an Order directing the Bureau of Prisons ("BOP") to issue a decision concerning

how Mr. Fana would serve his last 11 months in custody, recommending that he serve the remainder of his sentence on home confinement or in a halfway house pursuant to 18 U.S.C. § 3624(c)(1) and (2), and in the alternative, asking the Court, if no action was taken by the BOP, to resentence Mr. Fana to time served pursuant to 18 U.S.C. § 3582(c)(1)(A). The Court denied the compassionate release portion of Mr. Fana's motion without prejudice on April 10, 2020. *United States v. Fana*, 19-Cr-11 (GHW) at Dkt. #90 at p.10.

At the time of our letter, the BOP had not yet designated Mr. Fana, who was detained at the Metropolitan Detention Center without access to educational or vocational programs. He maintained a clean disciplinary record at MDC. In late November or early December 2020, he was transferred to Allenwood, where he was placed in quarantine for 21 days. He is now permitted out of his cell for 2 hours per day, but locked down for the remaining 22 hours as corrections officers try to contain the spread of the coronavirus within the institution. He has maintained a clean disciplinary record at Allenwood as well.

## II.     The COVID-19 Pandemic and Worsening Conditions at Allenwood Medium FCI

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic.[1] "COVID-19 is a serious disease" that makes certain populations of people severely ill and can lead to death.[2] The current best estimate is that the fatality rate among all demographics is "5-35 times the fatality associated with influenza infection."[3]

It is well established that the coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[4] Prisons are notoriously crowded places where self-quarantine, let alone "social distancing" is impossible. Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content.[5] Correctional health experts worry that no matter what precautions are taken by crowded prisons, these facilities may become incubators for the

---

[1] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19-11 March 2020*, World Health Organization (Mar. 11 2020), https://bit.ly/2W8dwpS.

[2] Declaration, Chris Beyrer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, ¶ 5 (Mar. 16, 2020), https://www.aclu-md.org/sites/default/files/field_documents/ex_d_-_beyrer_declaration_final.pdf.

[3] *Id*. at ¶ 11; *see also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID Journal (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

[4] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[5] Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?*,*" *ABA Journal* (March 13, 2020), available at https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

COVID-19 disease,[6] a fear borne out by the rising rates of infection in BOP facilities around the country.

Public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" thus, "infection control is challenging in these settings."[7] Indeed, individuals in unventilated or poorly ventilated areas for sustained periods of time face exponentially greater danger of infection than those who spend less time with others.[8]

As of January 10, 2021, Allenwood Medium had the tenth highest number of COVID cases of all BOP institutions, with 137 currently infected inmates and 24 currently infected staff members.[9] Insofar as Allenwood Medium has a total inmate population of 1,093 individuals, the infection rate is 12.5% of the population. In addition, we note that Allenwood Medium reports a total of 378 inmates have recovered from COVID-19.[10] Taken together, the "recovered" and currently infected inmates total nearly half of the institution's population.[11]

The increasing numbers of infected inmates at Allenwood have been noted with concern in news reports this fall and winter[12] and by Congressman Fred Keller who, on December 10, 2020, noted that, "it is clear that the Bureau of Prisons' (BOP) COVID-19 response plan has

---

[6] Michael Kaste, "Prisons and Jails Worry About Becoming Coronavirus 'Incubators'," *NPR* (March 13, 2020), available at https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[7] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[8] Mariano Zafra and Javier Salas, "A room, a bar and a classroom: how the coronavirus is spread through the air," *El Pais* (Oct. 29, 2020), available at https://english.elpais.com/society/2020-10-28/a-room-a-bar-and-a-class-how-the-coronavirus-is-spread-through-the-air.html?fbclid=IwAR025PQB9t2V0JyEC1HDRC_qbdssHr3SHW1CgKTjGC-iyYBajGPMjrr305w (last visited Nov. 18, 2020)

[9] *See* Federal Bureau of Prisons, COVID-19 Coronavirus, at https://www.bop.gov/coronavirus/

[10] *Id.*

[11] The Defense notes that, in compassionate release motions litigated on behalf of clients at other institutions, it has come to light that the Bureau of Prisons' records are unreliable and that it has designated inmates as "recovered" before they have, in fact, received a negative coronavirus test, and may, in fact, still be experiencing symptoms of the disease.

[12] Melissa Farenish, "FCI Allenwood deals with COVID-19 outbreak: 78 positive inmate tests and 23 staff," NorthCentralPA.com (Oct. 6, 2020), available at https://www.northcentralpa.com/life/covid-19_updates/fci-allenwood-deals-with-covid-19-outbreak-78-positive-inmate-tests-and-23-staff/article_4cc7ea5e-080d-11eb-a022-076e31972482.html; WKOK Staff, "A Major COVID-19 Outbreak at Allenwood Federal Prison," (Dec. 19, 2020), available at https://www.wkok.com/583392-2/

been inadequate in containing outbreaks."[13] Because Mr. Fana has less than eight full weeks of time remaining until his release date, which represents just 11 percent of his sentence, we ask the Court to consider whether he should be released now to home confinement for the remaining weeks of his carceral sentence. Release to home confinement now would both protect him from contracting COVID-19 and lower the inmate population at Allenwood Medium, thereby protecting other inmates and facility staff as well.

## DISCUSSION

### Under the First Step Act and Case Law in this Circuit, this Court Has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist and to Modify Mr. Fana's Sentence.

The First Step Act allows prisoners to move for compassionate release from prison when "extraordinary and compelling reasons" warrant such release. 18 U.S.C. § 3582(c)(1)(A)(i). In considering the merits of a motion for compassionate release, the Court:

> [U]pon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights . . . or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that the are applicable, if it finds that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).

**I. Mr. Fana Has Exhausted His Administrative Rights.**

A prisoner exhausts his administrative rights when the BOP fails to bring a motion for compassionate release on his behalf and he exercises all administrative rights to appeal, or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).

"[T]he hybrid requirement in this statute—either exhaust or wait 30 days—substantially reduces the importance of [protecting administrative agency authority], as it allows a defendant to come to court before the agency has rendered a final decision." *United States v. Haney*, ––– F.Supp.3d –––, –––, 2020 WL 1821988 at *3 (S.D.N.Y. Apr. 13, 2020) (Rakoff, *J.*) (citation omitted). As Judge Lawrence A. Vilardo in the Western District of New York has observed:

---

[13] Fred Keller, "Congressman Fred Keller responds to rise in COVID-19 cases in Union County federal prisons," In The News (Dec. 10, 2020), available at https://keller.house.gov/media/in-the-news/congressman-fred-keller-responds-rise-covid-19-cases-union-county-federal-prisons

> "The statute was "designed to 'enhance public safety' and 'make[ ] ... changes to Bureau of Prisons' policies and procedures to ensure prisoner and guard safety and security.' " *Scparta*, — F.Supp.3d at ——, 2020 WL 1910481, at *7 (alteration in original) (quoting H.R. Rep. No. 115-699, at 22 (2018)). Neither purpose is served by keeping a vulnerable individual incarcerated in precarious conditions that pose risks to not only his own health and safety, but also to the health and safety of the prison staff and the communities to which they return each day.

*United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *7 (W.D.N.Y. Apr. 22, 2020), *appeal withdrawn,* No. 20-1491, 2020 WL 4496494 (2d Cir. May 29, 2020).

In *United States v. Woodson*, 13-Cr-20180, in the Southern District of Florida, the Government's supplemental response to Mr. Woodson's motion for compassionate release explained that, "the official position of the Department of Justice as well as the Bureau of Prisons" is that "a defendant can file a motion for compassionate release in district court 30 days after requesting relief from the Warden, even if the Warden denies the relief within 30 days. *United States v. Woodson*, 13-Cr-20180 (CMA) (S.D.Fl.) at Dkt. 402 p.2.[14]

Mr. Fana has exhausted his administrative rights. He filed his request for compassionate release through counsel on April 2, 2020, and received a denial from the Warden on April 17, 2020. *See* Exhibit A.

## II. The BOP's Inability to Protect the Inmates In Its Care Is An "Extraordinary and Compelling" Circumstances Warranting Mr. Fana's Release.

The COVID-19 pandemic outbreak at Allenwoood Medium constitutes an "extraordinary and compelling" reasons for Mr. Fana's release. 18 U.S.C. § 3582(c)(1)(A)(i). Until the Second Circuit's decision in *United States v. Brooker*, No. 19-3218 CR, 2020 WL 5739712 (2d Cir. Sept. 25, 2020) courts deferred to USSG §1B1.13, Application Note 1 for the policy statement that dictated the necessary findings for "extraordinary and compelling" reasons. The *Brooker* Court however held that the narrow factual circumstances recited in Application Note 1 to Section 1B1.13 were not applicable to a motion brought by a defendant under 18 U.S.C. § 3582(c)(1)(A) as amended by the First Step Act. As Judge Paul A. Engelmayer in the Southern District of New York held in granting a motion for compassionate release:

> Consistent with *Brooker,* in assessing a §3582(c) motion brought directly by a defendant, the Court is not constrained by either §1B1.13's enumeration of extraordinary and compelling reasons, or its freestanding requirement that the defendant seeking release not pose any danger to the community. Rather, the

---

[14] *Woodson* continues, "In fact, the Bureau of Prison's website says as much: "[U]nder the FSA, an inmate may now file a motion for compassionate release directly with the sentencing court 30 days after making a request to the BOP or after exhausting their administrative remedies." *United States v. Woodson*, 13-Cr-20180 (CMA) (S.D.Fl.) at Dkt. 402 p.2 (referencing BOP website at https://www.bop.gov/inmates/fsa/faq.jsp#fsa_compassionate_release [under First Step Act: Frequently Asked Questions, Fed. Bureau of Prisons (accessed June 5, 2020)])

5

> Court, 'after considering the factors set forth in section 3553(a) to the extent that they are applicable,'" . . . may 'consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release.'"

*United States v. Lizardi*, 11-Cr-132 (PAE) (S.D.N.Y. Oct. 9, 2020) at *5 (referencing *Brooker*, 2020 WL 5739712, at *7). *See also United States v. Nero*, 13-Cr-271 (LTS) (SDNY Nov. 2, 2020) at Dkt. #1007 (referencing *Brooker*); *United States v. Jones*, 10-Cr-905 (LTS) (SDNY Oct. 19, 2020) Dkt. #2351 (same).

Under § 3553(a), the Court must consider what is "sufficient, but not greater than necessary, to comply with the purposes of [sentencing]," 18 U.S.C. § 3553(a), which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) [the kinds of sentence and sentencing range provided for in the USSG];
(5) any pertinent [Sentencing Commission policy statement];
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

Here, Mr. Fana has served nearly 90 percent of the sentence imposed by the Court on January 29, 2020, almost one year ago. He has done so under conditions far harsher and unimaginably more dangerous than the Court could have foreseen when the sentence was imposed, just a month before the first case of COVID-19 was confirmed in New York State on March 1, 2020. Because of the pandemic, he has been unable to see his family since March. He has suffered more than the usual restrictions on movement that come with a prison sentence, including lockdowns and quarantines, and extremely limited time in the fresh air. He has been unable to complete his GED because educational programming was paused due to the coronavirus pandemic.

The BOP's inability to protect the inmates in its care from the ravages of this virus is clear. Since March 2020, courts in this Circuit have granted numerous motions for compassionate release considering the "unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" (*United States v. Stephens*, 15-Cr-95 (ANJ) (S.D.N.Y. Mar. 18, 2020)) and recognizing that "[t]he more people we crowd into [federal facilities], the more we're

6

increasing the risk to the community" (*United States v. Raihan*, 20-Cr-68 (BMC) (E.D.N.Y. Mar. 12, 2020)). [15]

Similarly, former Attorney General William Barr directed the Bureau of Prisons to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."[16] Barr's memo noted that "for some eligible inmates, home confinement might be more effective in protecting their health" than continued confinement.

### III. Releasing Mr. Fana to Home Confinement Now Would Serve the Interests of Justice.

#### A. Release to Home Confinement Would Satisfy the Factors Under 18 U.S.C. § 3553(a)

We very respectfully suggest that release of Mr. Fana to home confinement now would be consistent both with the sentencing factors under 18 U.S.C. § 3553(a) and with former Attorney General Barr's directive. As the Court found when it originally sentenced Mr. Fana, he played a minor role in the offense of conviction. During his pretrial release, he fully complied with all conditions and, by the time of sentencing he had already taken substantial steps toward rehabilitation including efforts to earn his GED. His remorse was sincere. The Court recognized that neither specific nor general deterrence would be served by a Guidelines sentence, and varied downward from a low-end Guideline of 33 months to a sentence of just 16 months.

---

[15] *See also* cases granting release around the country, *e.g.*, *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481 *1 (E.D. Mich. Mar. 27, 2020) ("[T]he danger posed to Defendant in the Saginaw County Jail by the COVID-19 pandemic constitutes an independent compelling reason to temporarily release him from custody."); *United States v. Michaels*, No. SACR 16-76-JVS, 2020 WL 1482553 *1 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)); *United States v. Jaffee*, No. 19-CR-00088 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"); *United States v. Harris,* No. 19-CR-00356 (D.D.C. Mar. 26, 2020) (ECF No. 35) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Perez*, No. 19-CR-297, 2020 WL 1329225 *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should [h]e contract COVID-19"); *United States v. Stephens*, F.Supp.3d , 2020 WL 1295155 *2 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").

[16] Attorney General William Barr, *Memorandum for Director of Bureau of Prisons: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf

Mr. Fana has served almost 90 percent of the sentence imposed, and has done so under harsh and dangerous conditions, including lockdowns and quarantines both at the Metropolitan Detention Center and at Allenwood Medium, with no access to rehabilitative programming including educational or vocational courses, and no family visits. The sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions). The Court could not have foreseen the COVID-19 pandemic and the danger that it would pose to inmates such as Mr. Fana. However, now that the extent of the pandemic and the deadly nature of the virus is clear, we ask the Court to spare Mr. Fana from further incarceration under these harsh conditions.

If the Court grants this motion for compassionate release, Mr. Fana intends to return to his mother's home in the Bronx, where he will quarantine for 14 days before taking all possible steps, as permitted by Probation, to earn his GED and obtain the 30-hour OSHA course that will qualify him to look for construction work as circumstances permit. In addition, he hopes to be permitted to volunteer to speak to young people who are currently in the position that he was in at the time of his offense, to warn them of the negative effect that the streets had on his life and to steer them toward law-abiding lives in their community.

For all of these reasons, the § 3553(a) factors can be met in this case by home confinement as a condition of supervised release for the remaining months of Mr. Fana's sentence, and we ask the Court accordingly to modify Mr. Fana's sentence and to order his immediate release.

### B. Release to Home Confinement Would Be Consistent With the Former Attorney General's Directives.

The requested relief would be consistent with the directives issued by Attorney General William Barr. On March 26, 2020, Attorney General Barr issued guidance to the BOP directing it to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."[17] The memo noted that "for some eligible inmates, home confinement might be more effective in protecting their health" than continued confinement. The factors in that memorandum support a home confinement sentence for Mr. Fana:[18]

---

[17] Attorney General William Barr, *Memorandum for Director of Bureau of Prisons: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf

[18] See Attorney General William Barr, *Memorandum for Director of Bureau of Prisons: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf

1) *The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities*: Mr. Fana is incarcerated at a medium security facility.

2) *The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum*: Mr. Fana has not engaged in violent or gang-related activity while in prison.

3) *The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum*: According to the publicly available PATTERN score calculator[19] an inmate with Mr. Fana's characteristics would be in the low risk category.

4) *Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility*: If granted compassionate release, Mr. Fana would return to his mother's residence in the Bronx, where he would quarantine for 14 days in a bedroom. During his quarantine and thereafter, Mr. Fana would be able to observe social distancing practices; to maintain recommended levels of sanitation, including frequent hand-washing and surface disinfecting measures; and to avoid close contact with anyone outside his immediate family. In short, he would be able to take all of the steps to protect himself and those around him that he cannot take at Allenwood.

5) *The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention*: Mr. Fana's conviction was a noon-violent, low-level narcotics offense.

*"In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement."*

As discussed above, the infection rate at Allenwood Medium is over 12 percent—twice as high as the rate of infection in New York City as of the date of this letter. Even otherwise healthy individuals may suffer severe consequences from COVID-19 infection and Mr. Fana faces a far higher risk of infection from continued incarceration that he would if released to home confinement.

---

[19] See Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) Interactive Tool, at https://apps.urban.org/features/risk-assessment/

On April 3, 2020, Attorney General Barr expanded on the foregoing criteria and increased the eligibility for home confinement. Attorney General Barr urged the Director of the Bureau of Prisons to release more eligible prisoners in order to mitigate the spread of COVID-19 within BOP facilities.[20] Attorney General Barr emphasized that "time is of the essence" in implementing these directions.[21] The public health community agrees that:

> It is . . . an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible . . . Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.[22]

We urge the Court to grant Mr. Fana's request for compassionate release to serve the last two months of his sentence on home confinement. Doing so would protect Mr. Fana's life, serve the goals of sentencing, and protect the public interest.

## CONCLUSION

For the foregoing reasons, we respectfully ask the Court to grant Mr. Fana's request for compassionate release.

Respectfully,
/s/
Donna Newman, Esq.

Cc: AUSA Tara La Morte (by ECF)
     Nader Fana (by U.S. mail)

---

[20] Attorney General William Barr, *Memorandum For Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020) at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf
[21] *Id.*
[22] Declaration, Chris Beyrer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, ¶¶ 34, 36 (Mar. 16, 2020), https://www.aclu-md.org/sites/default/files/field_documents/ex_d_-_beyrer_declaration_final.pdf.